Nos. 25-1413 / 25-1414

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

MARY DOE; JOHN DOE A; JOHN DOE B; JOHN DOE C; JOHN DOE D; JOHN DOE E; JOHN DOE G; JOHN DOE H; MARY ROE,

Plaintiffs-Appellants Cross-Appellees,

v.

GRETCHEN WHITMER, Governor of the State of Michigan; JAMES GRADY, II, Colonel,

Defendants-Appellees Cross-Appellants.

Appeal from the United States District Court
Eastern District of Michigan, Southern Division
Honorable Mark A. Goldsmith

**BRIEF FOR DEFENDANTS–APPELLEES
AND CROSS–APPELLANTS**

Eric Jamison
Assistant Attorney General
Counsel of Record
Attorney for Defendants -
Appellees and Cross Appellants
State Operations Division
P.O. Box 30754
Lansing, MI  48909
(517) 335-7573

Dated:  October 31, 2025

## CORPORATE DISCLOSURE

State government and state agencies are excepted from filing a corporate affiliate/financial interest disclosure statement.

# TABLE OF CONTENTS

<u>Page</u>

Corporate Disclosure ................................................................. i

Table of Contents ...................................................................... ii

Table of Authorities ................................................................. v

Statement Regarding Oral Argument ................................... xii

Jurisdictional Statement ......................................................... 1

Statement of Issues Presented ............................................... 2

Introduction ............................................................................. 3

Statement of the Case ............................................................. 4

    A.    Procedural History ..................................................... 4

    B.    History of the SORA ................................................. 6

Standard of Review ............................................................... 10

Summary of Argument .......................................................... 11

Argument ............................................................................... 13

I.    2021 SORA does not violate the ex post facto clause. ... 13

    A.    *Willman* is controlling. ........................................... 13

    B.    SORA is not intended to be punishment, and it is not
        punitive. .................................................................... 19

        1.    The Legislature did not intend SORA to be
            punishment. ..................................................... 19

        2.    2021 SORA is not punitive. ............................ 20

II. Sex offenders with non-Michigan convictions are not entitled to a separate judicial hearing as a matter of course before having to register in Michigan. ........................................... 41

    A. There is no due process right to another hearing. ................... 42

        1. Registration requirements do not threaten a liberty or property interest. ......................................... 43

        2. The current process is sufficient. ................................ 46

        3. Registrants with non-Michigan convictions can seek judicial review of MSP's determination. ............. 47

    B. The full faith and credit clause requires Michigan to honor other states' convictions. ............................................ 49

III. Individualized review is not required to satisfy due process and equal protection. .......................................................... 50

    A. There is no fundamental right to individualized review ...... 50

    B. There is a rational basis for SORA registration. .................. 52

    C. Protecting against sex offenses is warranted. ...................... 54

    D. Individualized review is cost prohibitive ............................. 59

    E. The "science" related to sex offender re-offense rates is unclear at best. ...................................................................... 59

    F. Plaintiffs' equal protection claim fails. ................................ 64

IV. The Equal Protection Clause does not give every registrant the right to seek early removal from the registry. ........................ 65

    A. Not all registrants are similarly situated. ............................ 68

    B. The Legislature drew a rational line between who may seek early removal and who may not. .................................. 70

V. The district court correctly held that the SORA is not vague. ...... 73

A.   The legal underpinnings of vagueness challenges. .............. 73

B.   To be punishable, violations of SORA must be willful. ........ 75

C.   The statutory language is clear. .......................................... 76

Conclusion and Relief Requested ............................................... 79

Certificate of Compliance ....................................................... 80

Certificate of Service ............................................................ 81

Designation of Relevant District Court Documents ............................. 82

# TABLE OF AUTHORITIES

<u>Page</u>

## Cases

*Artway v. Atty. Gen.,*
  81 F.3d 1235 (3d. Cir. 1996) ................................................................. 67

*Barsky v. Bd. of Regents,*
  347 U.S. 442 (1954) ............................................................................. 74

*Bowman v. United States,*
  564 F.3d 765 (6th Cir. 2008) ............................................................... 68

*Cf. Johnson v. United States,*
  559 U.S. 133 (2010) ............................................................................. 73

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ....................................................................... 66, 68

*Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.,*
  470 F.3d 286 (6th Cir. 2006) ............................................................... 66

*Colautti v. Franklin,*
  439 U.S. 379 (1979) ............................................................................. 73

*Conn. Dep't of Pub. Safety v. Doe,*
  538 U.S. 1 (2003) ........................................................................... 42, 46

*Cutshall v. Sundquist,*
  193 F.3d 466 (6th Cir. 1999) ........................................... 43, 45, 46, 67

*Dandridge v. Williams,*
  397 U.S. 471 (1970) ............................................................................. 72

*Doe v. Cuomo,*
  755 F.3d 105 (2d Cir. 2014) ................................................................ 31

*Doe v. Lee,*
  102 F.4th 330 (6th Cir. 2024) ............................................................. 18

*Doe v. Mich. Dep't of State Police,*
    490 F.3d 491 (6th Cir. 2007) ................................................... 51, 53, 65

*Doe v. Moore,*
    410 F.3d 1337 (11th Cir. 2005) ........................................................ 67

*Doe v. Snyder,*
    101 F.Supp.3d 672 (E.D. Mich. 2015) ........................................... 52, 53

*Doe v. Snyder,*
    449 F.Supp.3d 719 (E.D. Mich. 2020) .............................................. 9

*Doe v. Snyder,*
    606 F.Supp.3d 608 (E.D. Mich. 2021) ............................................. 17

*Does #1-5 v. Snyder,*
    834 F.3d 696 (6th Cir. 2016) ....................................... passim

*Does v. Munoz,*
    507 F.3d 961 (6th Cir. 2007) ....................................... 52, 67

*Does v. Whitmer,*
    69 F.4th 300 (2023) ....................................... 10, 17

*Does v. Whitmer,*
    751 F.Supp.3d 761 (E.D. Mich. 2024) ........................................ passim

*Does v. Whitmer,*
    773 F.Supp.3d 380 (E.D. Mich. 2025) ..................................... 76, 77, 78

*F.C.C. v. Beach Commc'ns, Inc.,*
    508 U.S. 307 (1993) ............................................................... 67

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ............................................................... 74

Green Party of Tenn. v. Hargett,
    700 F.3d 816 (6th Cir. 2012) ..................................... 74, 75

*Hatton v. Bonner,*
    356 F.3d 955 (9th Cir. 2003) ............................................. 31

*In re Harder*,
  No. 368645, 2025 WL 825907 (Mich. Ct. App.
  Mar. 14, 2025) ........................................................ 35, 48, 49

*Johnson v. Robison*,
  415 U.S. 361 (1974) ........................................................ 68

*Johnson v. United States*,
  576 U.S. 591 (2015) ........................................................ 73

*Laster v. City of Kalamazoo*,
  746 F.3d 714 (6th Cir. 2014) .......................................... 10

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) .............................................. 42, 46, 47

*Matsushita Elec. Indus. v. Zenith Radio*,
  475 U.S. 574 (1986) ........................................................ 10

*McGuire v. Marshall*,
  50 F.4th 986 (11th Cir. 2022) ...................................... 24

*Meza v. Livingston*,
  607 F.3d 392 (5th Cir. 2010) ...................................... 46, 47

*Palko v. Conn.*,
  302 U.S. 319 (1937) ........................................................ 50

*Paul v. Davis*,
  424 U.S. 693 (1976) ........................................................ 45

*Peabody v. DiMeglio*,
  856 N.W.2d 245 (2014) .................................................. 49

*People v. Apgar*,
  690 N.W.2d 312 (2004) .................................................. 58

*People v. Betts*,
  968 N.W.2d 497 (2021) .................................................. 20

*People v. Lemons*,
  562 N.W.2d 447 (1997) .................................................. 57

*People v. Lewis,*
No. 304535, 2012 WL 4747214 (Mich. Ct. App. Oct. 4, 2012) ............57

*People v. McLaughlin,*
672 N.W.2d 860 (2003) ........................................................................58

*People v. Nyx,*
734 N.W.2d 548 (2007) ........................................................................57

*People v. Weissert,*
No. 359644, 2023 WL 4140809 (Mich. Ct. App. June 22, 2023)..........58

*People v. Yamat,*
714 N.W.2d 335 (2006) ........................................................................76

*Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.,*
894 F.3d 235 (6th Cir. 2018) ...............................................................74

*Reno v. Flores,*
507 U.S. 292 (1993) .............................................................................50

*Riddle v. Mundragon,*
83 F.3d 1197 (10th Cir. 1996) .............................................................67

*Shaw v. Patton,*
823 F.3d 556 (10th Cir. 2016) .............................................................32

*Smith v. Doe,*
538 U.S. 84 (2003) ...................................................................... passim

*Stauffer v. Gearhart,*
741 F.3d 574 (5th Cir. 2014) ..............................................................67

*Stephenson v. Cent. Mich. Univ.,*
897 F.Supp.2d 556 (E.D. Mich. 2012) ...........................................42, 46

*United States v. Coleman,*
675 F.3d 615 (6th Cir. 2012) ..............................................................19

*United States v. Lanier,*
520 U.S. 259 (1997) .............................................................................75

*United States v. Lemay,*
  260 F.3d 1018 (9th Cir. 2001) ............................................................ 67

*United States v. Marshall,*
  736 F.3d 492 (6th Cir. 2013) ........................................................ 69, 70

*United States v. May,*
  535 F.3d 912 (8th Cir. 2008) ............................................................. 31

*United States v. Nat'l Dairy Prods. Corp.,*
  372 U.S. 29 (1963) ........................................................................... 74

*United States v. Parks,*
  698 F.3d 1 (1st Cir. 2012) ................................................................. 31

*United States v. Under Seal,*
  709 F.3d 257 (4th Cir. 2013) ............................................................. 31

*United States v. W.B.H.,*
  664 F.3d 848 (11th Cir. 2011) ............................................... 32, 34, 36

*United States v. Wass,*
  954 F.3d 184 (4th Cir. 2020) ............................................................. 15

*United States v. White,*
  920 F.3d 1109 (6th Cir. 2019) ........................................................... 14

*United States v. Young,*
  585 F.3d 199 (5th Cir. 2009) ................................................... 15, 16, 31

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1982) ......................................................................... 75

*Washington v. Glucksberg,*
  521 U.S. 702 (1997) .................................................................... 50, 51

*Wiley v. WV House of Delegates,*
  No. 2:14-CV-10974, 2017 WL 663671 (S.D.W. Va. Jan. 30, 2017) ...... 67

*Willman v. Att'y Gen. of United States,*
  972 F.3d 819 (6th Cir. 2020) ..................................................... passim

*Windwalker v. Gov. of Alabama*,
  579 Fed.App'x 769 (11th Cir. 2014) ...................................................... 68

**Statutes**

1994 P.A. 295 ...................................................................................... 6

1996 P.A. 494 ...................................................................................... 6

1999 P.A. 85 ................................................................................... 6, 7

2005 P.A. 127 ...................................................................................... 7

2011 P.A. 17 ........................................................................................ 8

2020 P.A. 295 .................................................................................... 17

26 U.S.C. § 1 ............................................................................... 26, 78

26 U.S.C. § 7202 ............................................................................... 78

26 U.S.C. § 75 ................................................................................... 78

28 U.S.C. § 1291 ................................................................................. 1

28 U.S.C. § 1331 ................................................................................. 1

34 U.S.C. § 20901 .......................................................................... 6, 7

34 U.S.C. § 20927 .............................................................................. 7

M.C.L. § 28.721 ........................................................... 4, 19, 22, 53, 70

M.C.L. § 28.722 ................................................................... 8, 41, 69

M.C.L. § 28.723 ................................................................. 41, 49, 50

M.C.L. § 28.724 ............................................................................... 77

M.C.L. § 28.725 ...................................................................... passim

M.C.L. § 28.727 ......................................................................... 76, 78

M.C.L. § 28.728 ................................................... 6, 9, 17, 22, 68

M.C.L. § 28.729 ........................................................................... 29, 30, 76

M.C.L. § 28.733 ................................................................ 7, 9, 17, 21

M.C.L. § 28.734 ................................................................ 7, 9, 17, 21

M.C.L. § 28.735 ................................................................ 7, 9, 17, 21

M.C.L. § 28.736 ................................................................ 7, 9, 17, 21

M.C.L. § 600.631 ........................................................................ 48

M.C.L. § 691.1172 ...................................................................... 49

M.C.L. § 750.520 ........................................................................ 16

## Regulations

73 Fed. Reg. 38030 ...................................................................... 7

## Constitutional Provisions

Mich. Const. of 1963, art. VI § 28 ........................................... 48

U.S. Const. amend. XIV, § 1 .................................................... 66

U.S. Const., art. 4, § 1 ............................................................ 49

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested because despite the voluminous factual record developed below, the issues are largely legal issues based on well settled law.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the federal questions alleged in the complaint.  28 U.S.C. § 1331.  On April 22, 2025, the district court entered its amended final judgment.  On April 23, 2025, Plaintiffs filed a timely notice of appeal.  Accordingly, the Sixth Circuit has proper appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

1.    Did the district court err in finding that Michigan's new sex offender registration law violates the ex post facto clause?

2.    Did the district court wrongly decide that as a matter of due process, sex offenders with non-Michigan convictions are entitled to another judicial hearing in Michigan before they must register as a sex offender in Michigan?

3.    Are sex offenders entitled to individualized review to determine their ongoing registration obligations and should all sex offenders have the right to petition a court for removal from the registry, under either the due process clause or the equal protection clause?

4.    Can the Legislature decide who is eligible to petition for removal from the registry based on the age of the offender, or the severity of the conviction without violating the equal protection clause?

5.    Are statutory terms void for vagueness based on clever hypotheticals?

## INTRODUCTION

Despite the large record below, this case presents a straightforward question: does the Michigan Legislature have the authority to make line-drawing decisions about who belongs on its sex-offender registry, and for what duration?  Plaintiffs want the answer to be no—they seek to remove the line-drawing pen from the Legislature's hand because, in Plaintiffs view, there is a better way to structure a sex-offender registry.  The Constitution, however, does not enshrine Plaintiffs' policy preferences.

Over the last couple of decades, there has been seemingly endless litigation over sex-offender registries across the country, and Michigan is no exception.  The last round of litigation led to Michigan amending its registry to match the federal one, which this Court has already upheld as constitutional.

Victims of sex crimes, most of whom are children, suffer lifelong effects.  Registries provide accurate information about sex offenders to help members of the public protect themselves from potential future harms.  Michigan's amended sex-offender registry law accomplishes that goal without running afoul of the Constitution.

## STATEMENT OF THE CASE

### A.    Procedural History

This class action lawsuit was filed in 2022 challenging numerous provisions of the newly amended 2021 Sex Offender Registration Act (SORA).  M.C.L. § 28.721, *et seq*.  The law was amended after courts found some provisions of the old law to be unconstitutional.

After initial motions were denied without prejudice, the parties conducted discovery and filed cross motions for summary judgment in 2023.  (Opinion, R. 54, Page ID # 1847–52.)  On September 27, 2024, the district court granted in part, and denied in part, the cross motions for summary judgment on most claims.  (Opinion, R. 158, Page ID # 8662–8776.)

The court found for Plaintiffs on the (1) ex post facto claims; (2) the non-sex offense claim; (3) the non-Michigan offense claim; and (4) the claims related to admission of understanding registration obligations and chilling of speech related to reporting email addresses.

The court found in favor of the Defendants on the claims regarding (1) lack of individualized review; (2) unequal opportunity to petition; and (3) compelled speech.  (*Id.* at Page ID # 8775.)

4

On March 26, 2025, the district court issued another opinion related to severability and vagueness.  (Opinion, R. 171, Page ID # 9159–81.)  The court held the unconstitutional provisions could not be severed, and certain provisions were unconstitutionally vague and others were not.  (*Id*. at Page ID # 9168, 9172–81.)

The final judgment was entered on March 26, 2025.  (Judgment, R. 172, Page ID # 9183–97.)  The Defendants filed a motion for stay in the district court, which was denied.  (Motion, R. 173, Page ID # 9198–9226; Order, R. 192, Page ID # 9491–9504.)  The court entered an amended final judgment on April 22, 2025.  (Amended Judgment, R. 177, Page ID # 9377–92.)  Appeals were filed on several claims. Defendants did not appeal the claims related to reporting email addresses, compelled speech regarding the attestation that registrants understood their registration obligations, certain vagueness claims and the non-sex offense claim.  Since no appeal was filed on these claims, Defendants made changes to reporting requirements that are consistent with the district court's opinion.  The Defendants filed a motion for stay in this Court, which was granted with respect to the ex post facto and out-of-state claims on June 20, 2025.  (Doc. 28-1.)

## B.    History of the SORA

Since its enactment in 1994, the Michigan SORA has been amended many times, but the key revisions occurred in: (1) 1999 when the periodic reporting was added; (2) 2006 when the exclusionary zones were added; (3) 2011 when the Legislature added obligations consistent with the federal Sex Offender Registration and Notification Program (SORNA), 34 U.S.C. § 20901 *et seq.*; and (4) 2021 when the Legislature revised the law to ensure that it was not punitive.

*In 1994, Michigan enacts SORA.*

Michigan first enacted SORA in 1994.  1994 P.A. 295.  That same year, Congress passed a federal act, which "conditions certain federal law enforcement funding on the States' adoption of sex offender registration laws and sets minimum standards for state programs." *Smith v. Doe*, 538 U.S. 84, 89 (2003).  Shortly thereafter, in 1996, the Legislature required law-enforcement agencies to make offender information publicly available.  M.C.L. § 28.728(2); 1996 P.A. 494.

*In 1999, Michigan adds periodic in-person reporting.*

Offenders were required to report periodically in-person either annually or quarterly, depending on their offense.  M.C.L. § 28.725a(4) (a), (b); 1999 P.A. 85.  In addition, the Legislature required offenders to

6

update not just their address but also their work location or place of

education within 10 days.  M.C.L. § 28.725(1)(a); 1999 P.A. 85.

*In 2006, Michigan adds exclusionary zones to the SORA.*

The Legislature amended SORA in 2006 to create "student safety

zones," which generally prohibited offenders from residing, working, or

loitering within 1,000 feet of school property.  M.C.L. § 28.733–736

(2006); 2005 P.A. 127.

*In 2006, Congress enacts SORNA.*

Congress enacted SORNA to strengthen the nationwide network

of sex offender registries.  34 U.S.C. § 20901 *et seq.*  In addition to

updating the federal registry law, SORNA established minimum

standards for state registries to qualify for funding, and it created its

own substantive obligations under federal law.  *Willman v. Att'y Gen. of

United States*, 972 F.3d 819, 824 (6th Cir. 2020).

To maintain federal funding, states must "substantially

implement" SORNA.  34 U.S.C. § 20927(a) & (d).  SORNA also "directly

prescribes registration requirements that sex offenders must comply

with."  73 Fed. Reg. 38030, 38046.

*In 2011, Michigan amends its law to comply with federal standards.*

To comply with SORNA's minimum standards, Michigan again amended its registry law in 2011.  2011 P.A. 17.  The law imposed additional requirements not previously present in Michigan's law:

(1)   now classified offenders into three tiers based on their offenses, M.C.L. § 28.722(r)–(w) (2011);

(2)   required in-person reporting for changes to certain information within three business days, including changes to residence, place of employment, education, and name, as well as vehicle use or ownership, and e-mail address or other designations used in internet postings, M.C.L. § 28.725(1) and 28.725a(3)(c) (2011); and

(3)   required tier-III offenders to register for life, M.C.L. § 28.725(10)–(12) and § 28.725a(3) (2011).

The duty to register and update information basically remained the same, although the period was shortened to three days.  M.C.L. § 28.725(1) (2011); 2011 P.A. 17.

*In 2016 and 2020, federal courts ruled that 2011 SORA violated the ex post facto clause.*

In 2016, this Court reviewed an ex post facto challenge brought by plaintiffs who committed their offenses before 2006, and they argued that Michigan's SORA – as it existed pre-2021 – constituted punishment and was unconstitutional.  *Does #1-5 v. Snyder*, 834 F.3d

8

696 (6th Cir. 2016), cert den 138 S. Ct. 55 (2017). This Court found

three features to be punitive: (1) the student safety zones; (2) the public

classification of offenders into tiers; and (3) the in-person reporting

requirements for even minor changes. *Does #1-5*, 834 F.3d at 702–705.

In 2020, the federal district court ruled, in a class action lawsuit,

that the *Does #1-5* opinion applied to all the pre-2011 sex offenders.

*Doe v. Snyder*, 449 F.Supp. 3d 719, 729, 737 (E.D. Mich. 2020). The

court was prepared to enjoin the law, but provided a window for the

Legislature to amend the law. (*Id.*)

*In 2020, the Legislature amended the SORA.*

The Legislature revised Michigan's law to align with rulings that

found certain provisions to be unconstitutional. The Legislature

repealed the exclusionary zones, M.C.L. § 28.733-736, removed the

public nature of the tiering in M.C.L. § 28.728(2), and allowed the

Michigan State Police to accept changes to certain information by

methods other than in-person reporting. M.C.L. § 28.725(2). The law

took effect on March 24, 2021.

In a claim that state officials unconstitutionally continued to

apply the 2011 SORA after this Court's 2016 decision in *Does #1-5,* this

9

Court explained that the new law "removed or modified" the challenged

provisions.  The point bears repeating:

> Michigan passed a new (fourth) version of SORA, which became effective on March 24, 2021. *Ibid.  This new SORA removed or modified the provisions that Does II had declared unconstitutional.*

*Does v. Whitmer,* 69 F. 4th 300, 303 (2023).  With the changes to

Michigan law, the obligations under state law and under federal

SORNA are now virtually the same.  (Comparison Graphic, R. 41-

2, Page ID # 1385–89; Comparison Chart, R. 173-2, Page ID #

9231–9291.)

## STANDARD OF REVIEW

Summary judgment motions are reviewed de novo.  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).  The court should

review the evidence in the light most favorable to the non-moving party.

*Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

## SUMMARY OF ARGUMENT

**There is no ex post facto violation.**

2021 SORA does not violate the ex post facto clause.  It is modeled after the federal SORNA and is the same in all material respects.  This Court has already examined SORNA under an ex post facto challenge in *Willman* and found no constitutional deficiencies.  If this Court determines that *Willman* does not control, by applying the *Mendoza* factors, it is clear that 2021 SORA is not punitive.  As a result, 2021 SORA does not violate the ex post facto clause.

**Sex offenders from other states are not entitled to another hearing.**

Individuals convicted of sex offenses in jurisdictions other than Michigan have already been afforded all the process that they were due by the court that convicted them.  They are not required to be provided with another hearing in Michigan before they have to register in Michigan.  However, even if they are required to have another hearing to satisfy due process, that opportunity is already available under the Michigan Constitution and by statute.

**Sex offenders are not entitled to individualized review.**

States are free to enact sex offender registries based on the crime of conviction and do not need to provide individualized review for all sex offenders to determine whether they still must register. There is no constitutional violation simply because sex offenders are not provided a costly and time consuming process to try to determine whether they are an ongoing threat to society.

**Not all sex offenders must be provided with an opportunity to petition for removal from the registry.**

Legislatures are entitled to make judgment calls on who is eligible to petition for removal from the registry. Doing so based on the age of the perpetrator, and the seriousness of the crime, does not violate the constitution.

**The law is not vague because it is susceptible to clever hypotheticals.**

All laws must be reduced to writing, which by their nature are open to interpretation and clever hypotheticals. However, SORA gives ordinary people fair notice of what is required of them.

## ARGUMENT

## I.    2021 SORA does not violate the ex post facto clause.

The Michigan 2021 SORA contains the same obligations as the federal SORNA, which this Court has affirmed as non-punitive and thus not an ex post facto violation.  That same reasoning binds this Court here.  And a review of the five *Mendoza* factors identified in *Smith* only confirms the same.[1]  Federal appellate courts have reviewed the same basic features in the Michigan 2021 SORA in their decisions rejecting challenges to the federal SORNA.  The district court's analysis to the contrary was untenable and should be reversed.

### A.    *Willman* is controlling.

This Court found that SORNA, the federal law after which the Michigan SORA is modeled, is not an ex post facto violation.  *Willman*, 972 F.3d at 824.  The district court dispatched *Willman* as non-binding because this Court's analysis as too "terse."  *Does v. Whitmer*, 751 F.Supp.3d 761, 785-786 (E.D. Mich. 2024).  This was error, *Willman's*

---

[1] The U.S. Supreme Court identified the *Mendoza* factors in rejecting an ex post facto challenge to Alaska's sex offender registry.  *See Smith,* 538 U.S. at 97–105 (citing *Kennedy v. Mendoza–Martinez,* 372 U.S. at 144, 168–169 (1963)).

holding that SORNA did not constitute an ex post facto violation is
controlling. *United States v. White*, 920 F.3d 1109, 1115 (6th Cir. 2019)
("the [lower courts] should follow the case which directly controls")
(citations omitted).

Michigan's SORA is undistinguishable from SORNA. (*e.g.,*
registrants must provide nearly identical personal information under
both – registrants must report in-person periodically and must appear
in-person to report changes to certain personal information; the
registration terms are identical, and for some registrants, the
registration terms were imposed retroactively.) (Comparison graphic,
R. 41-2, Page ID # 1385–89; Comparison chart, R. 173-2, Page ID #
9231–9291.) There is virtually no daylight between them.

By finding that SORA violated the ex post facto clause despite it
being indistinguishable from SORNA, the district court defied not only
this Court's binding precedent in *Willman,* but also that of nearly every
circuit in the country. Aside from citing *Felts* as support that SORNA
does not violate the ex post facto clause, this Court also noted ten other

14

circuits that came to the same conclusion.  *See Willman*, 972 F.3d at 824–825.[2]

*Willman* cited approvingly to an opinion with a lengthy analysis of whether SORNA violated the ex post facto clause, including a discussion of the *Mendoza* factors.  *United States v. Wass*, 954 F.3d 184, 192 (4th Cir. 2020).  The challenge was twofold, first a challenge to criminal sanctions for failing to register as applied to pre-SORNA offenders, and second, a challenge to being subject to SORNA for all pre-SORNA offenders.  The court rejected both challenges and found no ex post facto violation.  (*Id*. at 193.)

Likewise, *Young* discussed the *Mendoza* factors when addressing whether SORNA, as a whole, was an ex post facto violation for a 2001

---

[2] Citing *United States v. Parks*, 698 F.3d 1, 6 (1st Cir. 2012); *United States v. Guzman*, 591 F.3d 83, 94 (2d Cir. 2010), *as amended* (Jan. 8, 2010); *United States v. Shenandoah*, 595 F.3d 151, 158–59 (3d Cir. 2010), *abrogated on other grounds by Reynolds v. United States*, 565 U.S. 432 (2012); *United States v. Wass*, 954 F.3d 184, 189–193 (4th Cir. 2020); *United States v. Young*, 585 F.3d 199, 206 (5th Cir. 2009); *United States v. Leach*, 639 F.3d 769, 773 (7th Cir. 2011), *abrogated in part on other grounds by Nichols*, 136 S. Ct. at 1113; *Bacon v. Neer*, 631 F.3d 875, 878 (8th Cir. 2011); *United States v. Elkins*, 683 F.3d 1039, 1045 (9th Cir. 2012); *United States v. Lawrance*, 548 F.3d 1329, 1336 (10th Cir. 2008); *United States v. W.B.H.*, 664 F.3d 848, 860 (11th Cir. 2011).

sex offense conviction.  It concluded that SORNA was not punitive and thus was not an ex post facto violation.  *United States v. Young*, 585 F.3d 199, 204 (5th Cir. 2009).

Some of the cases cited by this Court addressed the ex post facto question in the context of a prosecution for failing to register after SORNA was passed.  However, that does not undo the holding in *Willman* that SORNA did not run afoul of the ex post facto clause.  *Willman,* 972 F.3d at 824.  Willman was convicted for a 1993 sexual crime, i.e., assault with intent to commit criminal sexual conduct involving penetration in violation of M.C.L. § 750.520g(1).  (*Id.* at 822.)  SORNA was passed in 2006 and subjected him to registration, which means since 2006 he was on notice of his registration obligations.

Rather than rely on *Willman*, the district court relied on this Court's earlier ruling in *Does #1-5*, which reviewed Michigan's prior SORA before it was amended.  834 F.3d 696.  In *Does #1-5,* this Court found that the exclusionary zones and the in-person reporting requirements violated the ex post facto clause.  (*Id.* at 706.)  It did not discuss the retroactive extension of reporting requirements at all.  (*Id.)*

After the *Does #1-5* decision from this Court, and the later *Does* decision from the district court, the Legislature amended the SORA to address the provisions that the courts found unconstitutional. "The new SORA became effective March 24, 2021, and *all parties acknowledge that the new SORA removes or modifies all provisions that this court found to be unconstitutional* in its February 14, 202[0] opinion in *Does II*." *Doe v. Snyder*, 606 F.Supp.3d 608, 613 (E.D. Mich. 2021) (emphasis added). Recently, this Court also noted that 2021 SORA "removed or modified the provisions that *Does II* had declared unconstitutional." *Does v. Whitmer*, 69 F.4th 300, 303 (6th Cir. 2023).

The 2021 SORA repealed the exclusionary zones; removed the in-person reporting requirements for vehicle information, email addresses, internet identifiers, and telephone numbers; removed the registration requirement for the vast majority of juvenile offenders; removed the requirement for the remaining juvenile offenders to be listed on the public registry; and eliminated the public posting of tier information. 2020 P.A. 295; M.C.L. § 28.733-736; § 28.725(2)(a); and § 28.728(3)(e).

Under the 2011 SORA, registrants had "to appear in person before law enforcement to report even minor changes to their information."

17

*Does #1-5*, 834 F.3d at 705.  2021 SORA allows registrants to report minor changes by mail.  M.C.L. § 28.725(2).[3]

Quizzically, the district court opined that since MSP was not statutorily required to allow updates to be made by methods other than in-person, it was meaningless.  *Does*, 751 F.Supp.3d at 786, n 19.  The undisputed fact before the district court was that MSP allows minor changes in information to be made by mail.  (Update form, R. 126-18, Page ID # 6210–12; *see* n. 3.)  The district court opinion is inconsistent with this Court's reasoning, which took issue with requiring in-person reporting for minor changes.  *Does #1-5*, 834 F.3d at 705.

This Court recently explained that the *Does #1-5* opinion only enjoined enforcement of two amendments to 2011 SORA – the exclusionary zones and the requirement that "all registrants to appear in-person 'immediately' to update information such as new vehicles or 'internet identifiers' (*e.g.*, a new email account)."  *Doe v. Lee*, 102 F.4th 330, 337 (6th Cir. 2024).  Those updates can now be made by mail.

---

[3] *See* Michigan State Police, Forms, Sex Offender Registry, RI-004A – Michigan Sex Offender Registry Mail-In Update, https://www.michigan.gov/msp/forms-stats/forms (last accessed October 20, 2025).

**B.    SORA is not intended to be punishment, and it is not punitive.**

Even if *Willman* somehow was not binding precedent, the traditional analysis governing ex post claims commands the same conclusion: the new SORA does not violate the ex post facto clause because it was not intended to be punishment, and it is not punitive. "When determining whether a sex offender registration law violates the Ex Post Facto Clause, [the court] consider[s] (1) whether the legislature intended to impose punishment and (2), if not, whether the statutory scheme is so punitive in purpose or effect that it negates the legislature's intent to deem it civil." *United States v. Coleman*, 675 F.3d 615, 619 (6th Cir. 2012).

**1.    The Legislature did not intend SORA to be punishment.**

The district court correctly found that the new law was not intended to be punishment, and for good reason – the Michigan Legislature set forth its purpose when it passed the SORA into law – provide information to the public so they may protect themselves. M.C.L. § 28.721a.

The district court's conclusion is aligned with several courts, both state and federal, that have found that the Legislature did not intend to

impose punishment when it passed the SORA. "[W]e see no warrant for concluding that SORA's intent is punitive." *Does #1-5*, 834 F.3d 696, 700–01. "[W]e conclude that the [Michigan] Legislature likely intended [the] SORA as a civil regulation rather than a criminal punishment." *People v. Betts*, 968 N.W.2d 497, 508-09 (2021). Every court that has reviewed the issue, including the district court, concluded that the Legislature did not intend to impose punishment when enacting SORA.

### 2.    2021 SORA is not punitive.

To determine whether the law is punitive, the Court looks to five factors, whether: (1) it has been regarded in our history and traditions as a punishment; (2) it imposes an affirmative disability or restraint; (3) it promotes the traditional aims of punishment; (4) it has a rational connection to a non-punitive purpose; or (5) is excessive with respect to this purpose. *Smith*, 538 U.S. at 97 citing *Mendoza-Martinez*, 372 U.S. at 168–69. These factors are "neither exhaustive nor dispositive," but are "useful guideposts." *Smith*, 538 U.S. at 97. A review of the factors leads to the conclusion that 2021 SORA is not punitive.

### a. Does 2021 SORA resemble banishment, shaming, or probation or parole?

The district court correctly found that 2021 SORA does not resemble banishment since it did away with the exclusionary zones but erred when it held that it resembles shaming and probation/parole. *Does*, 751 F.Supp.3d at 790.  SORA 2021 resembles none of these markers of punitiveness.

**Banishment.**  2021 SORA does not resemble banishment because it no longer contains exclusionary zones that limited where registrants could live, work, or remain.  M.C.L. § 28.733-736.  Registrants are entitled to live, work, and remain as they choose.  Limitations on where registrants may live or work stem from the underlying conviction, and/or an entity's policies regarding hiring or renting housing to sex offenders.

**Shaming.**  While registrants may feel shame for being a sex offender, publicly shaming the sex offender is not a part of the regulatory system.  The information publicly provided is "accurate information about a criminal record, most of which is already public." *Smith*, 538 U.S. at 98.  "[O]ur criminal law tradition insists on public indictment, public trial, and public imposition of sentence."  (*Id.* at 99.)

21

("The publicity may cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism.  The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender.  Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation.").  *(Id.)*

2011 SORA made a registrant's tier classification publicly available, along with conviction information that was non-public.  *Does #1-5*, 834 F.3d at 702–03.  The Legislature removed the public reporting of a registrant's tier classification in the 2021 SORA.  M.C.L. § 28.728(3)(e).

Providing factual information about convicted sex offenders, including photos and related addresses, provides an "appropriate, comprehensive, and effective means to monitor those persons who pose . . . a potential danger" to the people of the state.  M.C.L. § 28.721a.  Those that are most often in danger are children.  Of the approximately 45,000 sex offender registrants, approximately 80% committed crimes

against children, i.e., either those under the age of 13 or those under the age of 18.  (Jegla Affidavit, R. 129-14, Page ID # 7693.)

While it may be helpful for the public to know some additional facts underlying the conviction, that information is not made public through the SORA.  (*E.g.,* 17-year-old defendant engaged in sexual penetrations with victim over three-year period when the victim was five to eight years old – compared with - criminal defendant, who was 22 that met the 15-year-old victim at an over 18 club and they were both willing participants in having a sexual relationship.)

Notably, registrants' email addresses and internet identifiers were never on the public facing website.  What is more, as a result of the district court's opinion, email addresses and internet identifiers are no longer collected from registrants at all.[4]  Similarly, there is no place on

---

[4] Consistent with the district court's March 26, 2025 opinion, these duties have already been eliminated.  *See* Michigan State Police, Forms, Sex Offender Registry, RI-004 and RI-004A, https://www.michigan.gov/msp/forms-stats/forms (last accessed October 20, 2025.)

the public website for the public to post comments about the registrants or participate in an online forum to shame the registrants.[5]

**Probation/Parole.**  2021 SORA is not like probation or parole. The district court provided a very brief analysis – "with significant restraints on registrants, including regular in-person reporting and the threat of imprisonment for failure to comply, SORA 2021 resembles the traditional punishments of parole/probation." *Does*, 751 F.Supp.3d at 791.  Other courts have rejected similar suggestions that registries are akin to parole or probation. *See, e.g., McGuire v. Marshall,* 50 F.4th 986, 1021 (11th Cir. 2022) ("We therefore reject his argument that this provision resembles probation or parole.")

The assertion that 2021 SORA imposes "significant restraints" defies the record.  Plaintiff John Doe G spends just two hours annually to verify his information with law enforcement.  (John Doe G Dep. Transcript, R. 125-9, Page ID # 5196.)  Plaintiff John Doe F spent just 4.5 hours over the course of a year verifying and reporting some changes to information.  (John Doe F Dep. Transcript, R. 125-8, Page ID

---

[5] *See* Michigan Sex Offender Registry, https://mspsor.com/ (last accessed October 20, 2025.)

# 5166.)  John Doe D has spent between three and twelve hours per year.  (John Doe D Dep. Transcript, R. 125-7, Page ID # 5149.)  Mary Doe spends between an hour and twenty minutes to four hours per year reporting.  (Mary Doe Dep. Transcript, R. 125-10, Page ID # 5219.)  For Mary Roe it is twenty minutes to four hours per year.  (Mary Roe Dep. Transcript, R. 125-11, Page ID # 5237.)  If this is a significant restraint, it is hard to imagine what would *not* qualify as a significant restraint.

As this evidence demonstrates, complying with the SORA is no more burdensome than routine licensing interactions everyday Michiganders have with the state in other contexts.

In 2022, Michigan residents appeared at Secretary of State offices to complete nearly seven million transactions, for vehicle renewals, transferring titles, registering vehicles, renewing licenses, licensing examinations, and changing addresses, among other types of transactions.  (Starkey Declaration, R. 128-23, Page ID # 7105.)  Many of these transactions must be completed in-person, regardless of age, health condition, cognitive ability or traveling difficulty.  (*Id*.)  Millions of Michigan residents show up every year to complete the transactions in-person, even when there is an online option for many services.  (*Id*.)

In another regulatory system, which has severe criminal penalties including prison time for failing to properly file, over 100 million people file federal taxes every year to determine their tax liability. The U.S. Tax Code spans more than 6,800 pages. 26 U.S.C. § 1, *et seq.* Every year, over a hundred million people must spend time preparing their taxes, collecting receipts, meeting with advisors, etc. But surely the IRS has not subjected every tax filer in the country to something resembling probation or parole.

Requiring several hours of time every year does not rise to the level of a significant registrant and is in-line with the amount of time required under other regulatory systems. Perhaps more salient is that 2021 SORA and probation or parole are two completely different species of interactions with the state. SORA only requires *notification*[6], but by contrast, probation and parole mandate obtaining *permission*. The obligations under probation pale in comparison to those under SORA.

---

[6] *See* n. 4.

| SORA requirements | Probation requirements (5 years)[7] | |
|---|---|---|
| Initial registration | Monthly reporting with PO and submission of monthly written reports | Must support dependents |
| Regular reporting (1x, 2x or 4x a year) | Cannot leave judicial district without permission | Must undergo regular drug testing |
| Update changes (minor changes can be updated by mail) | Required to work regularly | Must refrain from excessive use of alcohol |
| | Must notify probation officer (PO) at least ten days prior to change in employment or residence | Must notify third parties of risk occasioned by his criminal record and/or personal characteristics, as directed by PO |
| | Cannot possess a firearm | Cannot view pornography |
| | Cannot associate with anyone under the age of 18 without presence of responsible adult who is aware of conviction and who has been approved by PO | Must affirmatively disclose his conviction to any school where he may speak in his professional capacity, and to the parents of the children he may interact with |
| | Must permit PO to visit him at any time at home or elsewhere | Cannot frequent places where children congregate regularly |

---

[7] These examples come from two registrants' specific probation requirements, and from a sample of other registrant's probation requirements.  NWD Probation Conditions, R. 129-16, Page ID ## 7712–16; M.R. Plea Agreement, R. 129-11, Page ID ## 7658–7661; Probation and Parole Conditions R. 129-17, Page ID # 7720–51.

|  | Must be subject to, and pay for, sex offender diagnostic evaluations and polygraph examinations, as directed by PO | Must consent to unannounced examinations of all computer systems, including paying for computer monitoring systems |
|  | Must provide his computer passwords to PO | May access computer's only approved by PO |
|  | Must agree to searches of his person, residence and vehicle | Must agree to searches of his person, residence and vehicle |
|  | Must agree to searches of his person, residence and vehicle by PO | Must provide PO with access to his financial information, including billing records |
|  | Employment must be preapproved by PO | Only access the internet through one device |
|  | Cannot be employed where there would be contact with minors, or adults with disabilities, without approval of PO | Must affirmatively notify, anyone he dates or marries with a minor child, of his conviction |
|  | Prohibited from accessing any online computer service without approval by PO |  |

2021 SORA registration requirements do not meaningfully resemble probation or parole. The district court wrongly found in favor of Plaintiffs on this factor.

### b. Does 2021 SORA impose an affirmative disability or restraint?

The district could found that while 2011 SORA imposed more restraints, the 2021 SORA also imposes restraints by requiring in-person reporting of extensive information and carries criminal penalties for violations. *Does,* 751 F.Supp.3d at 791. That was wrong.

2011 SORA imposed an affirmative disability or restraint by severely limiting where registrants lived, worked, and loitered in large portions of the state, which severely restricted access to public transportation, employment opportunities, educational opportunities, counseling and mental health treatment, and medical care. 2011 SORA also potentially limited parenting activities such as attending parent teacher conferences, attending sporting events, or transporting kids to school.

Under 2011 SORA, numerous changes to regular life events had to be reported in-person, such as changes to vehicle information, email addresses, phone numbers, and temporary residence information.

Under 2011 SORA, violations for failing to appear to report periodically (annually, biannually, or quarterly under §5a) did not have to be willful. *See* M.C.L. § 28.729(2) (2011); Public Act 18 of 2011. In

other words, a registrant could have been imprisoned for failing to comply with a provision that they were unaware of or did not understand.

The 2021 SORA exhibits none of those restraints. The exclusionary zones are no longer part of the law, changes to minor types of information can be updated by mail, and there is a willfulness requirement for all violations, which requires a registrant to understand what is required by the law, and willfully violate it, before the registrant can be prosecuted. M.C.L. § 28.729(1), (2), (3), (4), (5), (6), and (7).

Even if there is any sort of disability or restraint in the 2021 SORA, it is not punitive - it imposes an affirmative duty to regularly report and to update law enforcement if specific personal information changes. It is the same level of "restraint" imposed by the federal SORNA. (Comparison chart, R. 173-2, Page ID # 9231–9291.)

Courts, including this one, have consistently found that the minimal restraint of in-person reporting is either not punitive, or is not a restraint at all.

*Willman*, 972 F.3d at 824; *United States v. Parks,* 698 F.3d 1, 6 (1st Cir. 2012) (concluding that in-person reporting is inconvenient but not enough to constitute punishment); *Doe v. Cuomo,* 755 F.3d 105, 112 (2d Cir. 2014) (holding that a requirement of quarterly in-person reporting is not punitive); *United States v. Under Seal,* 709 F.3d 257, 265 (4th Cir. 2013) ("Although [a sex offender] is required under [the Sex Offender Registration and Notification Act] to appear periodically in-person to verify his information and submit to a photograph, this is not an affirmative disability or restraint."); *United States v. Young*, 585 F.3d 199, 206 (5th Cir. 2009); *United States v. Felts*, 674 F.3d 599, 605–06 (6th Cir. 2012) ("To appear in-person to update a registration is doubtless more inconvenient than doing so by telephone, mail or web entry; but it serves the remedial purpose of establishing that the individual is in the vicinity and not in some other jurisdiction where he may not have registered, confirms identity by fingerprints and records the individual's current appearance"); *United States v. May*, 535 F.3d 912, 919–20 (8th Cir. 2008), abrogated on other grounds by *Reynolds v. United States*, 565 U.S. 432 (2012); *Hatton v. Bonner,* 356 F.3d 955, 964 (9th Cir. 2003) (stating that a California statute's requirement of in-

person reporting "is simply not enough to turn [the California statute] into an affirmative disability or restraint"); *Shaw v. Patton*, 823 F.3d 556, 568–69 (10th Cir. 2016) (holding that in-person reporting is not punitive); *United States v. W.B.H.,* 664 F.3d 848, 855, 857–58 (11th Cir. 2011) (concluding that a requirement of frequent, in-person reporting is "not enough" to change a statutory system from civil and regulatory to criminal and punitive).

This Court should find that 2021 SORA does not impose an affirmative disability or restraint.

### c. Does 2021 SORA promote the traditional aims of punishment?

This factor considers whether the law advances the traditional aims of punishment – incapacitation, retribution and deterrence. *Does #1-5,* 834 F.3d at 704.

The district court found this favor weighed in Plaintiffs favor. *Does*, 751 F.Supp. at 792. However, this Court afforded this factor little weight where, as here, many of the goals of punishment can also "be described as civil and regulatory." *Does #1-5*, 834 F.3d at 704.

The mere fact that 2021 SORA promotes deterrence, does not make it punitive. *Smith*, 538 U.S. at 102. Moreover, the central point

of the registry, as recognized by the district court, is to give information to members of the public so that they may protect themselves. *Does*, 751 F.Supp. at 795. ("SORA provides members of the public with valuable information that they can use to protect themselves and their families.") Such a purpose relates to the conduct of the public, as against the registrants themselves.

In particular, 2021 SORA encourages victims to come forward, which helps protect the public from the commission of potential future crimes. (Dare Affidavit, R. 129-4, Page ID ## 7571–74.) The registry is important for victims. "Victims prioritize not just the safety for themselves, for safety of others, and notifying a perpetrator of sexual assault to others in the community is part of that safety to others. Many victims state that they never want to see someone else victimized by their offender, and they view the registry as a proponent to potentially saving others. Many victims state that they have come forward to report their assault to law enforcement solely to prevent future assaults to others. In this vein, the registry protects the public." (Bennetts Declaration, R. 129-5, Page ID ## 7579.)

Registration obligations stem from the underlying offense, which is not retribution for the past offense, but provides information to the public. Federal SORNA has survived ex post facto scrutiny around the country. *See, e.g., W.B.H.*, 664 F.3d at 858–859 ("Regarding the traditional aims of punishment, SORNA is no different from the Alaska registration statute upheld in *Doe*.") Rather, federal SORNA has been repeatedly and consistently upheld as a source of important information for the public, and not punishment for registrants.

### d. Does 2021 SORA have a rational connection to a non-punitive purpose?

This is the most important factor, which the district court found to weigh in Defendants' favor. *Does*, 751 F.Supp.3d at 792; *Smith*, 538 U.S. at 102. ("The Act's rational connection to a nonpunitive purpose is a '[m]ost significant' factor in our determination that the statute's effects are not punitive.")

SORA 2021's non-punitive purpose of promoting public safety easily passes the low bar of rational. The district court found that the law promotes the goal of public safety by deterring first-time offenders and providing the public with information that they can use to protect themselves. (*Id*. at 795.) (*e.g.,* Susan has a teenage daughter. Susan

34

opts to not go on a date with 50-year-old Bob because he is on the sex offender registry for sexually assaulting a teenage girl when he was in his 40's. Since Susan decided not to date Bob, he cannot groom her teenage daughter or otherwise establish a trusting relationship with her. The registry limited Bob's access to potential victims.)

### e. Is 2021 SORA excessive?

The district court found in favor of Plaintiffs on this factor. *Does*, 751 F.Supp.3d at 795. The court reasoned that SORA exacts a heavy toll on registrants and there is still a debate about its effectiveness, especially in the ex post facto context. (*Id.*)

Notably, this conclusion is inconsistent with subsequent Michigan appellate court decisions that—in rejecting ex post facto challenges to Michigan's 2021 SORA—found that it was not excessive for those who committed sex offenses and "was reasonable in light of the legislative goal of promoting public safety." *In re Harder*, No. 368645, 2025 WL 825907, at *8 (Mich. Ct. App. Mar. 14, 2025) (citing *People v. Kiczenski*, No. 364957, 2024 WL 4595174, at *10 (Mich. Ct. App. Oct. 28, 2024) ("But where we part ways with that court [i.e., the federal district court here] is it not giving the weight factor 4 [rational connection to a non-

punitive purpose] is required to receive, and its conclusion that the amended 2021 SORA remains excessive.")

The federal courts have ruled the same for SORNA, which applies here as well. *See, e.g., W.B.H.*, 664 F.3d at 859–60 ("Both statutory regimes [i.e., SORNA and Alaska's SORA] group the offenders in categories instead of making individual determinations of dangerousness. Because *Doe* held that the regulatory scheme of the Alaska statute is not excessive in relation to its non-punitive purpose, it necessarily follows that SORNA's is not either.") It is a regulatory system designed to protect the public. It is not punitive and is not a violation of the ex post facto clause.

It is difficult to track metrics on the "effectiveness" of the registry because most sex crimes are not reported to police, and those that are rarely led to a conviction. One study from 2019 showed that of 2,887 reports of sexual assaults made to police across six U.S. jurisdictions, only 189 resulted in a conviction, meaning 2,698 reported assaults did not lead to a conviction or about 94%. (Dr. Goodman Report, R. 128-20, Page ID # 7022.) Providing accurate information to the public allows them to decide how and if they interact with sex offenders that may live

in their neighborhood, work at the local factory, or befriend them. (*See* example above regarding Susan and Bob.)

There is good reason to provide this information to the public. Sex offenders on Michigan's registry have a reconviction rate of more than 10% - of 44,000 registrants, 5,268, had a subsequent registrable offense. (Jegla Affidavit, R. 129-14, Page ID # 7692.) Plaintiffs identified a similar reconviction rate - "Of the 41,133 registrants currently subject to SORA who have ever returned to the community following their initial registrable offense conviction . . . [a]bout 10% (4,000) have been convicted of at least one subsequent registrable offense." ("Expert Report on Class Data, R. 123-6, Page ID # 3963.) Of course, that percentage is the floor for the actual rate of committing another sex offense. Estimates of serial sexual perpetration that rely solely on criminal history records are likely to substantially underestimate sexual reoffending. (Dr. Goodman Report, R. 128-20, Page ID # 7016.)

Given the seriousness and difficulty of the problem 2021 SORA is attempting to counteract, requiring those who have been convicted of criminal sexual conduct to report and periodically update their information is not excessive.

Plaintiffs will likely suggest that the Legislature could have made a better choice regulating sex offenders. They seemingly would like a system that requires registration only for those for whom an actuarial tool (Static 99-R) suggests a "high risk" of being convicted of another criminal sexual conduct offense. But the Static 99-R system is fatally flawed because it asks the wrong question: instead of measuring whether a person is likely to *commit* a future offense, it measures whether the person is likely to get *convicted* of a future offense.

Dr. Hanson, Plaintiffs' expert and the inventor of Static 99-R, made conclusions about risk levels (low to high) based on arbitrary definitions of risk levels. (Dr. Hanson Dep. Transcript, R. 125-3, Page ID ## 5027–28.) It is important to note that the control group that Dr. Hanson uses to compare risk levels are other people that have been incarcerated and not just an average member of the public. (*Id*. at 5034–35.)

Static 99-R scores do not account for sex offenses that were never reported; offenses that were reported to someone, but not reported to law enforcement; offenses reported to law enforcement but did not result in a charge; charges not resulting in convictions; charges but pled

38

down to non-sexual offenses; nor cases that do not end in a conviction. (Dr. Turner Report, R. 128-22, Page ID # 7080.)

Dr. Hanson conceded he was unaware of any state that uses Static-99R as a basis for determining how long someone needs to register as a sex offender.  (Dr. Hanson Dep. Transcript, R. 125-3, Page ID # 5034.)  When asked about whether static risk assessments need to be redone periodically as an offender's life circumstances or age changes, Dr. Hanson, admitted that "[i]f you want to get a precise estimate, reassessments help."  (*Id.* at 5042.)  Dr. Hanson admitted that he usually recommends that evaluators utilize multiple risk tools [when evaluating an offender] and he conceded that the comprehensive evaluations suggested by Drs Turner and Salter would be more accurate in assessing risk that just one static tool, if their method is sound.  (*Id.* at 5061.)

According to Dr. Turner, assessing one offender's risk of committing another offense (as opposed to being convicted for a subsequent offense) costs between $8,000 and $20,000 each, and takes from eight to 26 hours.  (Dr. Turner Report, R. 128-22, Page ID # 7091.) With approximately 44,000 registrants, it would cost between

39

$352,000,000 and $880,000,000 to conduct risk assessments of all current registrants. It would also take between 352,000 and 1,144,000 hours to conduct evaluations for all registrants.

But it may be even worse than Dr. Turner suggests. According to Dr. Salter, any comprehensive evaluation takes at least 15 hours. (Dr. Salter Report, R. 128-21, Page ID # 7067.) Based on her estimates, it would take at least 660,000 hours to conduct the evaluations.

Evan Dr. Hanson acknowledged that for a low-risk case, it would take a day or a day and a half, and for a higher risk case, it would take several days to complete a comprehensive evaluation. (*Id.* at 5022.) If we use Dr. Hanson's time estimates, and we arbitrarily say that 30,000 registrants are "low-risk" and 14,000 registrants are "high-risk", it would take approximately 217 years to complete the evaluations if someone worked seven days a week, 52 weeks a year.[8]

While there may be numerous types of registries, selecting one based on the crime of conviction does not make it excessive.

---

[8] (30,000 registrants * 1.25 days per evaluation = 37,500 days, or 102 years) + (14,000 registrants + 3 days per evaluation = 42,000 days, or 115 years)

## II. Sex offenders with non-Michigan convictions are not entitled to a separate judicial hearing as a matter of course before having to register in Michigan.

Plaintiffs alleged a procedural due process violation related to registrants with non-Michigan convictions.  (Amended Complaint, R. 108, Page ID # 2978.)

Sex offenders with non-Michigan convictions must register in Michigan under either M.C.L. § 28.723(1)(d), and/or under M.C.L. § 28.723(1)(a)-(c), (e) if the out-of-state conviction is "substantially similar" to a Michigan offense.  M.C.L. § 28.722(r)(xi), (t)(xii), (v)(x). These provisions provide independent basis for registration.  Even if there is no "substantially similar" offense under Michigan law, a person with a non-Michigan conviction must still register in Michigan based on the conviction from the non-Michigan jurisdiction.

Surprisingly, the district court never even identified what property or liberty interest was infringed upon and merely determined that the process itself was problematic.  *Does*, 751 F.Supp.3d at 818–20. The court did not explain why due process was required to "prove a fact that is not material to the State's statutory scheme" when § 28.723(1)(d) provides an independent basis to register in Michigan regardless of any

"substantially similar" analysis. *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 2 (2003). The district court wrongly concluded that sex offenders with non-Michigan convictions are entitled to another hearing before they must register in Michigan. *Does*, 751 F.Supp.3d at 818–21.

The more than 3,000 sex offenders with non-Michigan convictions enjoyed the full panoply of procedural rights required by the due process clause before they were convicted of their crimes. The due process clause does not require Michigan to provide those individuals with *another* hearing before requiring them to register.

## A. There is no due process right to another hearing.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319 (1976).

A two-step analysis is used: (1) determine "whether a liberty or property interest has been interfered with by the state" and (2) determine "whether the procedure used to deprive Plaintiff of such interest was constitutionally sufficient." *Stephenson v. Cent. Mich. Univ.*, 897 F.Supp.2d 556, 568 (E.D. Mich. 2012). Absent state

42

interference with a protected property or liberty interest, Plaintiffs are "entitled to no pre-deprivation process whatsoever." *Cutshall v. Sundquist*, 193 F.3d 466, 478 (6th Cir. 1999).

### 1. Registration requirements do not threaten a liberty or property interest.

Plaintiffs claim that 2021 SORA unconstitutionally infringes on various interests, none of which are constitutionally protected. (Amended Complaint, R. 108, at Page ID ## 2861–2918.)

As to Plaintiffs' claim that SORA interferes with their access to employment, this Court considered and rejected a similar argument and concluded that because the law did not infringe on the "ability to seek, obtain, and maintain a job. . . . the Act does not implicate a constitutionally protected liberty or property interest in employment." *Cutshall*, 193 F.3d at 470–80. SORA also "does not limit the ability of registrants to seek and obtain any type of employment." (*Id.* at 479.) Thus, SORA does not implicate a constitutionally protected liberty or property interest in employment.

Similarly, SORA does not limit the ability of registrants to travel, to pursue further education, or to obtain housing. Plaintiffs complain that "[r]egistrants must provide advance notice when they intend to

43

travel anywhere for more than seven days." (Amended Complaint, R. 108, at Page ID # 2888.) But providing notice does not mean that they are required to seek permission to travel. *Smith*, 538 U.S. at 101. ("Although registrants must inform the authorities after they change their facial features (such as growing a beard), borrow a car, or seek psychiatric treatment, they are not required to seek permission to do so.") And though Plaintiffs allege that being on the registry makes it more difficult for registrants to get an education or to obtain housing, SORA itself does not restrict access to either. (Amended Complaint, R. 108, at Page ID ## 2874, 2886.) Therefore, SORA does not implicate a constitutionally protected liberty or property interest in travel, education, or housing.

Furthermore, as to Plaintiffs' claims that SORA subjects them to ongoing reporting, surveillance, supervision, and criminal enforcement, such requirements are necessary to make a valid regulatory program effective. *Smith*, 538 U.S. at 102 ("It suffices to say the registration requirements make a valid regulatory program effective and do not impose punitive restraints.") Moreover, criminal enforcement of

reporting violations are subject to the same procedural safeguards as any other criminal proceeding.

To the extent that Plaintiffs attempt to cast their claim as an interference with their right to privacy, this Court has already concluded that registrants have "no constitutional right to keep [their] registry information from being disclosed." *Cutshall*, 193 F.3d at 481; *Smith*, 538 U.S. at 99 ("The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation.") Thus, SORA does not implicate a constitutionally protected liberty or property interest in Plaintiffs' right to privacy.

Lastly, Plaintiffs allege that the SORA subjects registrants to public stigmatization. However, the Supreme Court has determined that reputation alone does not constitute a protected liberty interest. *See Paul v. Davis*, 424 U.S. 693, 701–02, 711–12 (1976); *see also Cutshall*, 193 F.3d at 479. Rather, "[o]nly where the stigma of damage to a reputation is coupled with another interest, such as employment, is

45

procedural due process protection triggered." (*Id.*) Plaintiffs do not have a cognizable liberty or property interest related to their reputation. Any reputational damage is a collateral result of the registrant's conviction.

Plaintiffs cannot show that 2021 SORA interferes with a liberty or property interest.

### 2. The current process is sufficient.

Even if SORA registration threatened a protected liberty or property interest, its procedural protections are more than sufficient. *Stephenson*, 897 F.Supp.2d at 568.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (quotation marks and citation omitted; alteration in original). "When an individual is convicted of a sex offense, no further process is due before imposing sex offender conditions." *Meza v. Livingston*, 607 F.3d 392, 401 (5th Cir. 2010); *see also Conn. Dep't of Pub. Safety,* 538 U.S. at 7–8. Indeed, an "individual 'convicted of a sex crime in a prior adversarial setting, whether as the result of a bench trial, jury trial, or plea agreement, has received the minimum protections required by due

46

process.' " *Meza*, 607 F.3d at 401 (quoting *Neal v. Shimoda*, 131 F.3d 818, 831 (9th Cir. 1997)).  In contrast, an individual who has never been convicted of a sex crime, and who has neither stipulated nor judicially admitted to such facts of an offense is owed procedural due process before sex offender conditions may attach.  *Meza*, 607 F.3d at 401–02.

Here, Plaintiffs present no facts that an individual with a non-Michigan conviction has been subjected to registration under Michigan SORA without having already been convicted of a sex offense in another state.  (Amended Complaint, R.  108, at Page ID ## 2978–80.) Accordingly, Plaintiffs fail to present a situation that demands additional procedural protections.  *See Mathews*, 424 U.S. at 334.

### 3.  Registrants with non-Michigan convictions can seek judicial review of MSP's determination.

In finding that registrants should be given a hearing by a neutral decision maker, the district court ignored the fact that such a right already exists.  *Does*, 751 F.Supp.3d at 819–20.

SORA tasks MSP with determining the registration obligations of individuals who reside, work, or attend school in Michigan with convictions for non-Michigan offenses.  *Does*, 751 F.Supp.3d at 818. After making that determination, MSP sends the sex offender a letter

47

identifying what Tier of registrant they will be in Michigan. The letter includes an Explanation of Duties form that explains what and how often they have to report to law enforcement to verify their information. (Morris Dep, R. 126-8, Page ID #6028; n. 4.)

Under the Michigan Constitution and by statute, individuals have the right to seek judicial review of agency decisions. *See* Mich. Const. of 1963, art. VI § 28 ("All final decision, findings, ruling and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law"); and *see* M.C.L. § 600.631 (providing for an appeal from agency decisions.) Registrants have brought challenges to their registration obligations, including many of the lead Plaintiffs in this lawsuit who are no longer listed on the public registry and others in state court proceedings. *See* e.g., *In re Harder*, No. 368645, 2025 WL 825907 (Mich. Ct. App. Mar. 14, 2025).

The district court seemingly rejected that process and found a due process violation. *Does,* 751 F.Supp.3d at 819.

**B.    The full faith and credit clause requires Michigan to honor other states' convictions.**

The full faith and credit clause of the U.S. Constitution requires each state to honor the actions and judgment of another state's courts. U.S. Const., art. 4, § 1.  Michigan enshrined the clause in statute when it enacted the Uniform Enforcement of Foreign Judgments Act.  M.C.L. § 691.1172.  A foreign judgment "is treated as a Michigan judgment and Michigan law applies to its enforcement."  *Peabody v. DiMeglio*, 856 N.W.2d 245, 249 (2014).

Michigan courts recently examined this clause and explained the interplay between an out-of-state conviction, including a subsequent order allowing the person to be removed from the convicting states registry, and the full faith and credit clause.  *In re Harder*, No. 368645, 2025 WL 825907, at *7 (Mich. Ct. App. Mar. 14, 2025.)  The court held that even if the convicting state allowed the person to be removed from the Iowa registry, due to the full faith and credit clause, the person still had to register in Michigan under § 28.723(1)(d) because Michigan courts have to recognize the underlying Iowa conviction.  (*Id.*)

Accordingly, if someone is convicted of a sex crime in another

state, Michigan honors that judgment and requires them to register in

Michigan under M.C.L. § 28.723(1)(d).  No additional hearing is needed.

## III.  Individualized review is not required to satisfy due process and equal protection.

The district court properly rejected Plaintiffs' argument that 2021

SORA violates the due process clause by imposing registration

requirements without considering an individual's risk of reoffending.

### A.  There is no fundamental right to individualized review.

The substantive component of the due process clause protects

"fundamental rights" that are so "implicit in the concept of ordered

liberty" that "neither liberty nor justice would exist if they were

sacrificed." *Palko v. Conn.*, 302 U.S. 319, 325 (1937).  Thus, courts

reviewing a substantive due process claim must first determine a

"careful description of the asserted right," *Reno v. Flores*, 507 U.S. 292,

302 (1993), and then determine if that right is "deeply rooted in this

Nation's history and tradition" and "implicit in the concept of ordered

liberty," such that it can be considered a "fundamental right."

*Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

Fundamental rights include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity." (*Id.*) at 720. "The Supreme Court has cautioned, however, that it has 'always been reluctant to expand the concept of substantive Due Process because guideposts for responsible decision making in this unchartered area are scarce and open-ended.'" *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 500 (6th Cir. 2007) (quoting *Glucksburg*, 521 U.S. at 720).

If a statute does not implicate a plaintiff's fundamental rights, rational-basis review applies. *Does*, 490 F.3d at 501. Under rational basis review, the question is "whether the statute at issue is 'rationally related to legitimate government interests.'" (*Id.*) "This standard is highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances." (*Id.*)

Here, Plaintiffs do not have a fundamental right to be free from SORA registration requirements. *See e.g.*, *id.* at 500 (concluding that the plaintiffs' asserted right of having their "HYTA records . . . sealed and exempted from public disclosure because, at the conclusion of their youthful trainee status, the criminal charges against them were or will

be dismissed" did not constitute a "fundamental right deeply rooted in our Nation's history"); *Does v. Munoz*, 507 F.3d 961, 964–65 (6th Cir. 2007) (rejecting the plaintiffs' argument that their inclusion on the registry burdened their right to privacy and created difficulties in retaining housing, keeping and finding employment, and pursuing educational opportunities and family relationships).

Additionally, although Plaintiffs claim that 2021 SORA impacts their fundamental rights of speech, work, and travel, 2021 SORA infringes on none of these asserted rights.

"Because Plaintiffs provide no basis for reviewing the retroactive application of SORA's lifetime registration requirement using a heightened level of scrutiny," this Court should uphold 2021 SORA if it is justified by a "rational legislative purpose." *Doe v. Snyder*, 101 F.Supp.3d 672, 708 (E.D. Mich. 2015) (quotation marks and citation omitted).

## B.    There is a rational basis for SORA registration.

The Legislature enacted 2021 SORA "with the intent to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal

52

sexual acts by convicted sex offenders." M.C.L. § 28.721a. The Legislature "determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state." (*Id.*) Furthermore, "[t]he registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger." (*Id.*)

This Court has previously concluded that states have a compelling interest in protecting public safety. *See Doe*, 490 F.3d at 505; *Snyder*, 101 F.Supp.3d 672, 708. Furthermore, this Court has concluded that "providing the public and law enforcement with the means to monitor sex offenders who were convicted twenty years ago is rationally related to protecting public safety." *Snyder*, 101 F.Supp.3d 672, 708. Thus, providing accurate information to the public about individuals convicted of sex offenses is rationally related to the Legislature's public safety concerns. (*Id.*)

53

The registry is a tool for people to use to potentially prevent criminal sexual activity from happening in the first instance. It provides factual information to the public so residents may decide how to interact with individuals that are registered sex offenders. (*e.g.*, a member of the public may decide not to date someone on the registry; or a member of the public may decide not to let their children be cared for a neighbor that is a registered sex offender.) There is good reason for the public to have this information.

### C.    Protecting against sex offenses is warranted.

Victims of sexual assault, who are mostly children, often suffer lifelong consequences. (Mary Roe Dep. Transcript, R. 125-11, Page ID # 5236, p. 24:12-26:8; Def's Statement of Facts, R. 129-1, Page ID # 7206.) They experience depression, struggle with trusting relationships, subject themselves to substance abuse, and engage in self-harming behaviors. (Def's Statement of Facts, R. 129-1, Page ID # 7206.)

One victim is quoted as stating:

> This one single afternoon completely changed the trajectory of my life and ruined any semblance of a happy childhood. I had never kissed a boy before, had only started my period a year prior and thought I had five years before my first gynecologist visit. Instead, my first sexual experience with a man was a violent rape, and instead of a first visit with an OB/GYN, I was subjected to an invasive rape kit in the ER.

54

Every part of my naked body was examined and
photographed.  Every item I was wearing was sealed in an
evidence bag, never to be returned to me.  I was 13 years
old.

The physical trauma didn't stop there, though, as I was
given Plan B to prevent an extremely unwanted pregnancy,
an emergency antiviral medication in case of HIV exposure.
This cocktail of medications was very strong and made me
quite ill.  I fainted that first night and hit my head hard on
the wall on the way down.  This was how I spent my 8th
grade spring break.[9]

One of the registrants who was handpicked to provide a declaration

for this case to seemingly explain how difficult it is to be a sex offender,

illustrates another reason for the registry.

In 2005, M.R. was convicted under 18 U.S.C. 2422B for coercion and

enticement of a minor.  (M.R. Dep. Transcript, R. 125-15, Page ID #

5347, p. 42:14.)  Through an online chat room, M.R. met an undercover

FBI agent posing as an adult woman and her juvenile daughter.  (*Id.* at

p. 42:16-25; 43:1-9.)  The fictitious persons were a woman named "Lori"

who was approximately 30 years old and her daughter "Laci," who was

12 years old.  (M.R. Plea Agreement, R. 129-11, Page ID # 7667.)

---

[9] *See* Attorney General: Attorney General Nessel Files Emergency
Appeal to Reverse Parole of Convicted Rapist and Kidnapper, Secures
Stay of Release (michigan.gov) (last accessed October 16, 2025.)

While M.R. stated in his deposition that he believed the daughter was 14 years old and that he was not sexually attracted to 14-year-old females (M.R. Dep. Transcript, R. 125-15, Page ID ## 5347–48, p. 43:25; 45:4-5), the FBI Affidavit used as part of his conviction, asserts that M.R. was advised several times that Laci was 12 years old and yet he still "expressed his desires to engage in sex with Laci." (M.R. Plea Agreement, R. 129-11, Page ID # 7668.)

When the undercover FBI agent posing as Lori asked M.R. what he specifically wanted from the child, he stated "'I enjoy oral sex'... 'and I enjoy intercourse'." (*Id.*) Afterwards, during his interview with police, M.R. "admitted receiving child pornography on his own and/or his business computers connected to the Internet" as well as admitted that "had fantasies about having sex with children." (*Id.* at 7671.) M.R. "inquired if there was a possibility of a '3 some' with the mother and daughter" and was "looking for items to purchase for Laci." (M.R. Plea Agreement, R. 129-11, Page ID ## 7668, 7671.) M.R. did indeed purchase items for the 12-year-old Laci - at the time of his arrest, police found condoms and lingerie for the 12-year-old child with M.R. (*Id.* at 7656.)

56

In M.R.'s recent sworn deposition testimony, he stated that he was only interested in having sex with the adult woman.  (M.R. Dep. Transcript, R. 125-15, Page ID # 5348, p. 45:12-20.)  This statement directly contradicts information asserted in the FBI Affidavit.  It is unclear why there is such a discrepancy, but what is clear is that the public should be aware if M.R. lives next door, or volunteers to work with teenagers.

The following cases provide some additional context of what the Legislature is trying to protect against[10]:

- Criminal defendant, who was the dean of a school, was convicted of criminal sexual conduct with a child between 13-15 years old. *People v. Nyx*, 734 N.W.2d 548, 551 (2007).

- Criminal defendant, convicted of criminal sexual conduct based on 17-year-old victims' testimony that she lost consciousness after drinking alcohol and awoke as different men were having intercourse with her and someone video recorded it.  *People v. Lewis*, No. 304535, 2012 WL 4747214, at *1 (Mich. Ct. App. Oct. 4, 2012).

- Criminal defendant was convicted of criminal sexual conduct against her own children, who were under 13 at the time of the offense.  The abuse spanned years and included the parents forcing the children to perform sex acts on their siblings and on their parents.  *People v. Lemons*, 562 N.W.2d 447, 450 (1997).

---

[10] *See* also Summary of various offenses, R. 129-10, Page ID # # 7601–48.

- Criminal defendant was convicted of criminal sexual conduct against a 13-year-old victim. The victim willingly got into a car with the defendants and two other guys. She was forced to consume drugs while a knife-like object was pressed against her neck. After arriving at an unfamiliar home, the Defendant held the knife-like object against the victim's neck and threatened to kill her during intercourse. The other two guys also forced the victim to perform oral sex on them while yielding the knifelike object. The victim had a tattoo burned onto her chest before being forced to perform sexual acts. *People v. Apgar*, 690 N.W.2d 312, 315 (2004), *overruled by People v. White*, 905 N.W.2d 228 (2017).

- Criminal defendant was convicted of criminal sexual conduct committed against a former romantic partner. The defendant picked up a butcher knife from the kitchen, told the victim to undress (this was during a time she was recovering from spine surgery), which she refused. Defendant held the knife to her neck, and she complied with the demand to undress. The victim was raped. After the assault, she was dragged by her hair to the shower to rinse off and was held in a chokehold when she tried to escape. *People v. McLaughlin*, 672 N.W.2d 860, 866-867 (2003).

- Criminal defendant, a 44-year-old male, was convicted of criminal sexual conduct committed against a six-year-old child. The victim was a relative of the defendant and she was staying the night at his home when the assault occurred. Near the time of the assault, the child stated that her mouth was covered with duct tape while the defendant sexually assaulted her. Other acts evidence was also submitted at trial. *People v. Weissert*, No. 359644, 2023 WL 4140809, at *2 (Mich. Ct. App. June 22, 2023).

It is rational for the Legislature to provide accurate information about sex offenders to the public.

### D.    Individualized review is cost prohibitive

Aside from the fact that Plaintiffs do not really explain what individualized review would look like for over 40,000 sex offenders, its towering costs are prohibitive compared to the relatively straightforward conviction-based approach used by the Legislature.

As explained above, estimates for an individualized risk assessments ranged from $352,000,000 - $880,000,000 for all current sex offenders, which could take between 352,000 and 1,140,000 hours to complete.  (Def's response to Pl's facts, R. 129-2, Page ID ## 7295–96; Dr. Turner Report, R. 128-22, Page ID # 7091.)  Even if the Legislature adopted Plaintiffs' suggestion that a static risk assessment tool (Static 99-R) could be used, it would still take between 11,000 and 44,000 hours to complete.  (Def's response to Pl's facts, R. 129-2, Page ID ## 7295–96.)  However, as explained above, there are serious limitations to the tool.

### E.    The "science" related to sex offender re-offense rates is unclear at best.

"There is nothing irrational in choosing a bright line rule for a sex offender registration system."  *Does*, 751 F.Supp.3d 798.  It is up to the

Legislature, not the courts to decide on the wisdom of legislation. (*Id.*) (citations omitted.) This is especially true where science is unclear.

Both parties retained experts and obtained lay witness declarations that try to fill in the gaps created by the gross underreporting of sexual assault so that the court can better understand the nature and extent of criminal sexual conduct. Plaintiffs presented opinions about recidivism that are largely based on criminal justice data of subsequent arrests or convictions and presented opinions about other ancillary issues.

Defendants presented opinions based on experience of prosecutors and others that work with victims; data from the Michigan registry; professionals that have decades of experience working with sex offenders; and academics that have examined re-offense rates by looking at rape kits and how often a single perpetrator committed multiple rapes. (Dare Affidavit, R. 129-4, Page ID ## 7571–74; Bennetts Declaration, R. 129-5, Page ID ## 7576 – 7582; Seldon Declaration, R. 129-18, Page ID ## 7753–55; Prout Declaration, R. 129-15, Page ID ## 7695–7702; Dr. Lovell Report, R. 128-19, Page ID ## 6983–95; Dr. Goodman Report, R. 128-20, Page ID ## 7013–43; Dr.

Salter Report, R. 128-21, Page ID ## 7052–70; Dr. Turner Report, R. 128-22, Page ID ## 7080–92.)

The district court agreed with Defendants and found that "the social science regarding the efficacy of SORA in reducing recidivism is mixed" and "courts reviewing the scientific literature have expressed the view that there is no universally accepted scientific view about the efficacy of registration systems." *Does,* 751 F.Supp.3d at 792, 808.

Due to the personal nature of sexual based crimes and the numerous reasons why victims do not report the crime, even with all the information developed in the record, we still do not have a complete picture of who is likely to sexually reoffend. Reconviction data is a small sliver of the story, but it is far from the entire story. (Def's response to Pl's facts, R. 129-2, Page ID ## 7315–17.)

Defendants direct this Court to the studies of those within law enforcement and the findings and declarations of other governmental agencies – including the Michigan Legislature – on the questions whether these regulatory systems of registration and reporting for sex offenders are effective tools for the public to use to try to prevent becoming victims of a sexual crime. For this question, the Department of

Justice, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART), issued a report in 2017,[11] in which it determined that studies challenging the efficacy of registries are "inconclusive" and "mixed," noting that a "lack of sufficient scientific rigor" may further limit the value of studies in this arena:

> In summary, research on the effectiveness of SORN [sex offender registration and notification] remains relatively limited and findings from the studies are somewhat *inconclusive*. Findings from time series studies are *mixed*. Some studies find lower rates of sex crimes following SORN implementation, while others do not. Studies based on a comparison of outcomes for sex offenders subject and not subject to SORN also produced *mixed findings*. *An arguable lack of sufficient scientific rigor may further cloud the import of studies in this area*. Therefore, the results of SORN research undertaken to date continue to leave open questions about the effects of registration and community notification requirements.
>
> Finally, few if any studies to date have examined the multifaceted elements of registration laws, generally, or SORNA, specifically which incorporates requirements, procedures and information sharing and enforcement mechanisms going beyond those prevalent in SORN programs examined in past studies.

---

[11] The document may be found at:

https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/soma pi_full_report.pdf (last accessed October 17, 2025.)

U.S. Department of Justice, "Sex Offender Management Assessment and Planning Initiative," March 2017, p. 202 (emphasis added; paragraph break added).]

In fact, more recently, the Office of Justice Programs within the DOJ did a survey in 2022 of four studies and three articles regarding the effect on registries on recidivism, reaching essentially the same conclusions. *See* Office of Justice Programs, "Sex Offender Registration and Notification Act—Summary and Assessment of Research," April 2022, p. 18 ("The research is not conclusive about whether SORN laws have mitigated sex offender recidivism."); *id.* at 23 ("More often than not, the selected documents were critical of SORNA, either calling for a reform of SORNA's mandate or the outright repeal of the Act. However, as discussed throughout this report, *the studies reviewed all contained serious methodological shortcomings in their research designs and data analyses.*") (emphasis added.)[12]

SORA is a tool that is used by Michiganders to protect themselves, and their children, from becoming victims of a sexual crime. Indeed,

---

[12] *See* https://www.ojp.gov/pdffiles1/smart/305231.pdf (last accessed October 17, 2025.)

even Mary Doe testified that she would like to know information about certain perpetrators if they lived next door or taught piano lessons to children. (Mary Doe Dep Transcript, R. 125-10, Page ID ## 5221–22.) In fact, Mary Doe testified about an unfortunate event in her grandchild's life that might not have happened if she had more information about the perpetrator. (*Id.*)

In the end, the Supreme Court's statement about the reliance on categorical judgments in the Alaska registry is equally applicable here: "The *Ex Post Facto* Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences." *Smith,* 538 U.S. at 103–04. In the same way that Alaska's law and SORNA are valid, so is Michigan's 2021 SORA.

### F.   Plaintiffs' equal protection claim fails.

Plaintiffs argue that 2021 SORA violates the equal protection clause by imposing lengthy lifetime registration with no consideration of an individual's risk of reoffending.

However, the district court correctly determined that Plaintiffs failed to develop that argument by not showing how they have been

disparately treated compared to similarly situated persons, as is required for any equal protection claim. *Does,* 751 F.Supp.3d at 811.

Even if Plaintiffs had developed the argument, it overlooks the fact that it "is the province of the legislature" to engage in this "kind of line-drawing." *Doe*, 490 F.3d at 504. Indeed, "[s]tatutes create many classifications which do not deny equal protection; it is only invidious discrimination which offends the Constitution." (*Id.* at 505.) (quotation marks and citation omitted).

Although the Legislature could have gone farther than it did with respect to who is eligible to petition, it does not make the statute invalid. *See Doe*, 490 F.3d at 505; and *see Smith*, 538 U.S. at 103. "Indeed, rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." (*Id.)* (quotation marks and citation omitted).

## IV.  The Equal Protection Clause does not give every registrant the right to seek early removal from the registry.

Plaintiffs assert that there are no material differences between the sex offenders that can petition for removal from the registry and those that cannot petition from removal, thus is violative of the equal protection clause. (Pl's Br., pp. 61–69.) Not so.

The district court correctly found that Plaintiffs failed to show that they have been treated disparately compared to similarly situated persons. *Does,* 751 F.Supp.3d at 811.

The equal protection clause commands that "no state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause of the Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985). A plaintiff must show that the government treated him "disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.,* 470 F.3d 286, 299 (6th Cir. 2006). As the U.S. Supreme Court aptly stated:

> Whether embodied in the Fourteenth Amendment or inferred from the Fifth [Due Process Clause], equal protection is *not a license for courts to judge the wisdom, fairness, or logic of legislative choices*. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights *must be upheld against equal protection*

*challenge if there is any reasonably conceivable state of facts*
*that could provide a rational basis for the classification.*

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (emphasis added).  A legislative choice may be "based on rational speculation unsupported by evidence or empirical data."  (*Id*. at 315.)

Unless the legislative classification under attack involves a suspect class, the classification need only be rationally related to a legitimate government goal.  *See Cutshall*, 493 F.3d at 482 (citing *Chapman v. United States*, 500 U.S. 453 (1991)).  This Court and other federal circuits have universally held that "sex offenders" are not a suspect class.  *Does v. Munoz*, 507 F.3d 961, 966 (6th Cir. 2007); *Cutshall*, 493 F.3d at 482–83; *Wiley v. WV House of Delegates*, No. 2:14-CV-10974, 2017 WL 663671, at *7 (S.D.W. Va. Jan. 30, 2017), report and recommendation adopted sub nom., 2017 WL 663350 (S.D.W. Va. Feb. 17, 2017) (citing *Roe v. Marcotte*, 193 F.3d 72 (2d. Cir. 1999)); *Artway v. Atty. Gen.*, 81 F.3d 1235 (3d. Cir. 1996); *Stauffer v. Gearhart*, 741 F.3d 574, 587 (5th Cir. 2014); *United States v. Lemay*, 260 F.3d 1018, 1030–31 (9th Cir. 2001); *Riddle v. Mundragon*, 83 F.3d 1197, 1207 (10th Cir. 1996); *Doe v. Moore*, 410 F.3d 1337, 1346 (11th Cir. 2005); *Windwalker v. Gov. of Alabama*, 579 Fed.App'x 769 (11th Cir.

2014)).  "Legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440.

Under rational-basis review, "the question is whether the regulation at issue is rationally related to legitimate government interests." *Bowman v. United States*, 564 F.3d 765, 776 (6th Cir. 2008) (citation and quotations omitted).  "Courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances." (*Id*. at 776) (citation omitted).  A rational-basis classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Johnson v. Robison*, 415 U.S. 361, 374–75 (1974).

## A.   Not all registrants are similarly situated.

Under the Michigan SORA, two groups of registrants can petition for removal – Tier I registrants, and some that were adjudicated as juveniles.  M.C.L. § 28.728c(1), (2), and (3); *Does*, 751 F.Supp.3d at 811–12.  Although the line may not be one the Plaintiffs agree with, the

Legislature drew a line that allows about 12% of registrants to petition a court for removal from the registry. *Does*, 751 F.Supp.3d at 812.

Tier I offenses include many non-contact offenses and offenses that on their face are less egregious than Tier II or Tier III offenses. Tier I offenses include surveilling a person clad in undergarments; possessing child sexually abusive material; and engaging in prostitution, among others. M.C.L. § 28.722(r)(i)-(xi).

Tier II offenses include accosting a child for immoral purposes; having more than one Tier I conviction; involving a minor in commercial sexual activity; and second degree criminal sexual conduct, among others. M.C.L. § 28.722(t)(i)-(xiii).

Tier III offenses include sexual penetration with a person under 13 years of age; and assault with intent to commit criminal sexual conduct, among others. M.C.L. § 28.722(v)(i)-(ix).

It is well recognized that juveniles are treated differently under the criminal justice system because they "have diminished culpability and greater prospects for reform." *United States v. Marshall*, 736 F.3d 492, 498 (6th Cir. 2013) (citing *Miller v. Alabama*, 567 U.S. 460, 470 (2012)). Juveniles are still developing, learning to be responsible and

69

their character is still being shaped.  (*Id.*)  It isn't surprising that the

Legislature allowed juveniles to petition for removal from the registry

because juveniles are not similarly situated as adults.

### B.    The Legislature drew a rational line between who may seek early removal and who may not.

The Legislature explained that the state interest in enacting the

SORA is to assist the people of the state to prevent and protect against

the commission of future criminal sexual acts by convicted sex offenders

and to allow people to monitor those who pose a potential danger.

M.C.L. § 28.721a.

Here, the Michigan Legislature exercised its discretion and made

a judgment call that certain sex offenders convicted of lesser crimes,

may petition for removal from the registry.  It is similar to other

circumstances where different facts lead to less serious offenses eligible

for more lenient treatment (*e.g.,* someone convicted of manslaughter

may be eligible for parole sooner than someone convicted of second-

degree murder).

Plaintiffs do not claim that they have been treated any differently

than other individuals who have been convicted of the same offenses.

They argue that since their own experts opine that the crime of

conviction purportedly does not correlate with risk, then everyone should have the same opportunity to petition for removal.

However, that is not what is required under rational basis review—is the difference rationally related to the purpose—*i.e.*, is it rational to allow sex offenders who are convicted of surveying a person in their undergarments to petition for removal after a number of years, and not allow an adult who sexually penetrated a young child to petition for removal from the registry. Cleary, it is rational.

Of course, there are situations among the tens of thousands of registrants that seem to support the idea that specific registrants should be able to petition for removal from the registry – Plaintiffs point to Doe C and Mary Roe.[13] (Pl's Br., p. 55.) However, the line drawn by the Legislature does not need to be perfect. "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws

_____

[13] Coincidentally, John Doe C and Mary Roe are not on the public registry as a result of relief they have obtained through the judicial process so even if they are not eligible to petition for removal of all obligations to register, they have obtained meaningful relief by not being on the public registry.

are imperfect.  If the classification has some 'reasonable basis,' it does
not offend the Constitution simply because the classification 'is not
made with mathematical nicety or because in practice it results in some
inequality.' " *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (citation
omitted.)

The district court correctly held that there was no equal protection
violation.  *Does*, 751 F.Supp.3d at 811.  The court reasoned that there
was a material difference between those that are eligible to petition for
removal, and those that are not – those eligible to petition for removal
committed offenses that the Legislature deemed to be less serious.  (*Id.*)
at 813.  The court found that even if there was no material difference,
the statutory scheme satisfies rational basis review, which for the
reasons stated above, it does.  (*Id.*)  The court correctly relied on
*Baxtrom*, which Plaintiffs try to differentiate by explaining that those
eligible to petition for removal are "similarly situated in all material
respects" when there are obviously material differences between those
who can petition and those who cannot—age at time of offense and
severity of crime.  (*Id.*)  This Court should affirm the district court's
decision.

72

**V.  The district court correctly held that the SORA is not vague.**

On appeal, Plaintiffs opine that the district court erred in holding three provisions of Michigan SORA are not vague—reporting requirements related to education, work and operating vehicles. Plaintiffs' arguments are not really that the provisions are vague but that they are too onerous.

**A.    The legal underpinnings of vagueness challenges.**

Due process challenges rooted in vagueness require a "criminal law (1) so vague that it fails to give ordinary people fair notice of the conduct it punishes, or (2) so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (citations omitted.)

Fair notice requires a statute to give notice to "a person of ordinary intelligence . . . that his [or her] contemplated conduct is forbidden by the statute." *Colautti v. Franklin*, 439 U.S. 379, 390 (1979) (internal quotation marks omitted).  "It is an intrinsic aspect of language that every word contains some degree of ambiguity. *Cf. Johnson v. United States,* 559 U.S. 133, 139 (2010) (Scalia, J.) ("[C]ontext determines meaning.")

Evaluating a law for vagueness is not an overly rigid analysis—laws do not run afoul of the due process clause "simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). And laws are not vague because they "may be stringent and harsh." *Barsky v. Bd. of Regents*, 347 U.S. 442, 448 (1954).

Laws do not run afoul of the due process clause simply because they are "susceptible to clever hypotheticals." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 894 F.3d 235, 251 (6th Cir. 2018). By their nature, laws are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).

When examining a state statute for vagueness, federal courts must construe the statute wherever possible "to avoid constitutional difficulty." *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 825 (6th Cir. 2012). That framework compels the Court to adopt any reasonable construction of the statutory terms. (*Id.*) (citing *Chapman v. United States*, 500 U.S. 453, 464 (1991). A statute can only be found facially

vague if a "plaintiff [ ] demonstrate[s] that the law is impermissibly vague in *all* of its applications." (*Id.*) That is a high bar, which Plaintiffs cannot clear.

**B.    To be punishable, violations of SORA must be willful.**

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 489 (1982). The Supreme Court has "recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." (*Id.* at 499.) "[A]s a sort of 'junior version of the vagueness doctrine,' the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier,* 520 U.S. 259, 266 (1997).

To the extent that there is any vagueness, 2021 SORA's scienter requirement mitigates any ambiguity and due to the rule of lenity in

criminal statutes, the law only applies to conduct clearly covered. M.C.L. § 28.729.

### C.    The statutory language is clear.

**Vehicles.**  Registrants must report vehicles "operated by the individual."  M.C.L. § 28.727(j).  The SORA definition of vehicle points to the Michigan Vehicle Code (MVC), which implicitly incorporates the concepts of "operating" as those terms are defined in the MVC.  As the district court pointed out, the MVC defines operating and is not vague. *Does v. Whitmer*, 773 F.Supp.3d 380, 396 (E.D. Mich. 2025).

Indeed, the Michigan Supreme Court has already offered guidance on what "operate" means.  *See People v. Yamat*, 714 N.W.2d 335-337 (2006) (holding that the term "operate" is not ambiguous and means the exercise of actual physical control over a motor vehicle.)

There is no serious argument that registrants are not on fair notice of what it means to operate a vehicle.  While it may be burdensome to report every vehicle operated, it is not vague.

**Education.**  Registrants must report if, as part of their course of studies at an institution of higher education in Michigan, they are

present at any other location in the state or another state.  M.C.L. §

28.724a(1)(b).

Plaintiffs posit that it is unclear what "part of [one's] course of

studies" means.  (Pl's Br., p. 70.)  Plaintiffs only present clever

hypotheticals and question whether a registrant must report visiting a

rest stop along the toll road, or stopping to fill up with gas, or stopping

for lunch, on their way to Cleveland to attend a conference as part of

the studies must be reported as being "present at any location."  (*Id.* at

70–71.)

The district court correctly found that there is nothing unclear

about this reporting requirement - short-term travel as part of one's

course of studies such as attending a conference, research at another

school's library, or a two-hour field trip would be reportable.  *Does*, 773

F.Supp.3d at 399.

A person of ordinary intelligence would not believe that they need

to report a rest stop as being "present at any location" on the way to

Cleveland to attend a conference as part of their studies.

**Work.**  The SORA requires registrants to report work.  M.C.L. § 28.727(1)(f).  The district court found that even reporting de minimus work is clear from the text of the statute.  *Does*, 773 F.Supp.3d at 397.

There can be a myriad of hypotheticals around the edges about what constitutes employment, but the language is not vague.  Every year over 100 million people file federal taxes to report their income, which can come from various sources.  The U.S. Tax Code spans more than 6,800 pages.  26 U.S.C. § 1 *et seq*.  The expansive law covers most citizens with an income and has severe criminal penalties for failing to properly file taxes, including prison time.  26 U.S.C. § 75.  Like SORA, many criminal sections of the Tax Code include a willfulness requirement.  26 U.S.C. § 7202.  If millions upon millions of people can file their taxes every year and make determinations about what income is taxable, then a registrant of ordinary intelligence should be able to determine what employment is.

## CONCLUSION AND RELIEF REQUESTED

For the reasons stated above, as Appellees-Defendants they respectfully request that this Court affirm the district court decisions related to the claims for individualized review in Count III, the claims regarding rights to petition for removal in Count IV, and the vagueness claims in Count VIII.

As Cross Appellants-Defendants they respectfully request that this Court reverse the district court decisions related to the ex post facto claims in Counts I & II, and claim regarding sex offenders with non-Michigan convictions in Count XI.

Respectfully submitted,

*/s/Eric Jamison*
Assistant Attorney General
Counsel of Record
Attorney for Defendants -
Appellees and Cross Appellants
State Operations Division
P.O. Box 30754
Lansing, MI  48909
(517) 335-7573
jamisone@michigan.gov

Dated:  October 31, 2025

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the part of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains no more than 15,300 words.  This document contains 15,049 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Century Schoolbook.

*/s/Eric Jamison*
Assistant Attorney General
Counsel of Record
Attorney for Defendants -
Appellees and Cross Appellants
State Operations Division
P.O. Box 30754
Lansing, MI  48909
(517) 335-7573
jamisone@michigan.gov

## CERTIFICATE OF SERVICE

I certify that on October 31, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

*/s/Eric Jamison*
Assistant Attorney General
Counsel of Record
Attorney for Defendants -
Appellees and Cross Appellants
State Operations Division
P.O. Box 30754
Lansing, MI  48909
(517) 335-7573
jamisone@michigan.gov

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Defendants-Appellees and Cross Appellants, per Sixth Circuit

Rule 28(a), 28(a)(1)-(2), 30(b), hereby designated the following portions

of the record on appeal:

| Description of Entry | Date | Record Entry No. | Page ID No. Range |
|---|---|---|---|
| Amended Judgment | 04/22/2025 | R. 177 | 9377–92 |
| Comparison Graphic | 05/31/2022 | R. 41-2 | 1385–89 |
| Comparison Chart | 04/11/2025 | R. 173-2 | 9231–91 |
| SORA update form | 10/02/2023 | R. 126-18 | 6210–12 |
| Jegla Affidavit | 11/21/2023 | R. 129-14 | 7691-93 |
| John Doe G Dep Transcript | 10/02/2023 | R. 125-9 | 5182-5203 |
| John Doe F Dep Transcript | 10/02/2023 | R. 125-8 | 5158-81 |
| John Doe D Dep Transcript | 10/02/2023 | R. 125-7 | 5140-57 |
| Mary Doe Dep Transcript | 10/02/2023 | R. 125-10 | 5204-27 |
| Mary Roe Dep Transcript | 10/02/2023 | R. 125-11 | 5228-49 |
| Starkey Declaration | 10/02/2023 | R. 128-23 | 7104-05 |
| Dare Affidavit | 11/21/2023 | R. 129-4 | 7570-74 |
| Bennetts Declaration | 11/21/2023 | R. 129-5 | 7575-82 |
| Dr. Goodman Report | 10/02/2023 | R. 128-20 | 7012-50 |

| Dr. Hanson Dep Transcript | 10/02/2023 | R. 125-3 | 5017-78 |
|---|---|---|---|
| Dr. Turner Report | 10/02/2023 | R. 128-22 | 7079-7103 |
| Dr. Salter Report | 10/02/2023 | R. 128-21 | 7051-58 |
| Morris Dep Transcript | 10/02/2023 | R. 126-8 | 6000-66 |
| Def's Statement of Material Facts | 11/21/2023 | R. 129-1 | 7205-29 |
| M.R. Dep Transcript | 10/02/2023 | R. 125-15 | 5336-56 |
| M.R. Affidavit and Plea | 11/21/2023 | R. 129-11 | 7649-72 |
| Summary of various offenses | 11/21/2023 | R. 129-10 | 7601-48 |
| Def's Response to Pl's Statement of Material Facts | 11/21/2023 | R. 129-2 | 7230-7568 |
| Seldon Declaration | 11/21/2023 | R. 129-18 | 7752-7755 |
| Prout Declaration | 11/21/2023 | R. 129-15 | 7694-7711 |
| Dr. Lovell Report | 11/21/2023 | R. 128-19 | 6982-7011 |

2022-0341402-B